Samuels, J.
This is an action of ejectment, brought before the Code of 1849 was enacted. It is therefore incumbent on the plaintiff to sustain his action by proving a right of entry in his lessors at the time the action was brought. The only evidence offered on the trial was that of the plaintiff; and to this the defendant demurred. We must, therefore, regard as fact every thing which was directly proved by the testimony, or which the jury might have fairly inferred from it.
It must, therefore, be taken as true, that the property sued for by the plaintiff and that held by the defendants is the same property. That William Hepburn had title in fee to the premises, and that he held possession, claiming such title from the year 1796, at least, until his death in the year 1817. That by his will he devised the same to Letty, sometimes called Letitia Hepburn, a woman of color, and a bastard. That Letty, by her guardian, or by her husband, had possession of the property from Hepburn’s death until her own death in 1823 or 1S24, after having had living issue, which died in her lifetime. That Letty’s mother being dead, Moses and Julianna, lessors of the *221 plaintiff, are the bastard brother and sister of Letty, and the only surviving issue of Letty’s mother. That Grymes, the husband of Letty, held the property as tenant by the curtesy until his death in 1834. The question of capacity in Letty, Moses and Julianna respectively, to take or transmit the inheritance, turns upon the same facts. It appears that they were the children of Esther, a slave, the property of William Hepburn, and were thus born slaves. That Hepburn, on the 1st of February 1816, conveyed Esther and her said children to Hannah Jackson, a woman of color, the sister of Esther; (a question is made, to be considered hereafter, whether Hannah Jackson had capacity to acquire title to these slaves, or to emancipate them.) That Hannah Jackson executed a deed of emancipation, dated February 12, 1816, in due form of law, whereby she set free Esther and her children, if she had capacity in law to acquire and manumit slaves. In regard to this question of capacity, it appears that Hannah Jackson had been the slave of one John Harper. That Harper, on the 23d of October 1810, in consideration of one hundred and ninety-six dollars, sold and by deed conveyed Hannah to one William Goddard for the term of ten years, and no more; and at the end of that time, set her free; and also set free any child or children of Hannah, born during her servitude. This deed was executed in form to operate as a deed of prospective emancipation. On the 24th of October 1810, Goddard executed a deed of emancipation, setting Hannah free whenever payment of the said sum of one hundred and ninety-six dollars, and the interest thereon, should be made; and providing that the receipt in full for the payment should be taken and admitted as complete testimony of such discharge. These deeds were duly recorded December 2d, 1811. It is shown by the evidence that Hannah Jackson acted as a free woman in *222 buying and holding property. The evidence is not clear as.to the precise time at which she began so to act; but from the fact that the deeds of emancipation from Harper and Goddard respectively, were withheld from the record from October 1810 to December 1811, and then recorded, and that Hepburn, on the 1st February 1816, sold Esther and her children to Hannah, and that no question has been made by those interested to make one about the status of Hannah or of Esther and her children, it may be inferred that every thing was rightly done in regard to them on the 1st February 1816. There is no force, I conceive, in the objection that the payment of the hundred and ninety-six dollars and its interest could be proved only by Goddard’s receipt. The deeds of emancipation and registry thereof, and the fact of payment, completed the manumission; and the payment is sufficiently shown by the circumstances above stated, which occurred soon after the date of Goddard’s deed. The provision in regard to the receipt was intended for the benefit of the freed woman; to give it a weight and force beyond that usually given to a mere receipt; to make it complete testimony. I am of opinion that Hannah Jackson was a free woman on the 1st of February 1816; that Hepburn’s conveyance of that date passed to her his title to Esther and her children; and that her deed of the 12th February 1816 was effectual to emancipate them.
Holding then that Letty had capacity to take and transmit the inheritance by descent, that Moses and Julianna were of capacity to take the inheritance if the law cast it upon them, the bastard brother and sister of Letty, the question is presented whether the law of descents did so cast the inheritance ?
If the estate in controversy had been within the jurisdiction of Virginia, and subject to her laws at the time of Letty’s death, there would have been no *223 reason to doubt the right of Moses and Julianna, the bastard brother and sister, to succeed to her estate. The statute of October 1785, 12 Hen. Stat. p. 138, prescribes the course for descents of real estate. Section 16 enacts that “bastards also shall be capable of inheriting or transmitting inheritance on the part of their mother in like manner as if they had been lawfully begotten of such mother.” The statute of October 1785 has been repeatedly re-enacted in Virginia with some modifications; the clause above cited, however, has always been re-enacted without change, and is now the law of Virginia. 1 Rev. Code of 1819, p. 357, § 18; p. 523, § 5. This court long since decided under this statute, that bastards might transmit inheritance collaterally on the part of the mother. Garland v. Harrison, 8 Leigh 368. This construction of the statute may now be regarded as the settled law of Virginia. It is said, however, and said truly, that at the time of Letty’s death this property was beyond the jurisdiction of the state of Virginia, and that the law of that part of the district of Columbia in which it lay regulated the descent. Conceding this, it becomes necessary to ascertain what was the law in that locality. The congress of the United States was the legislature for the district of Columbia, having authority and charged with the duty to provide laws therein. It was accordingly enacted by the statute February 27, 1801, 2 Statutes at Large, p. — $ 1, “ that the laws of the state of Virginia, as they now exist, shall be and continue in force in that part of the district of Columbia which was ceded by the said state to the United States, and by them accepted for the permanent seat of government,” &c. The statute of October 1785, as modified and reenacted by the act of December 8, 1792, thus became the law of that part of the district of Columbia which is now the county of Alexandria, and which includes *224 the property in controversy. Section 18 of the act of 1792 is the same as section 16 of the act of 1785 in regard to descents to or from bastards. Thus it is shown that the case of Garland v. Harrison, above cited, should rule this case, unless something is made to appear requiring a different ruling.
It is said that the Supreme court, .in Stevenson's heirs v. Sullivant, 5 Wheat. R. 207, placed a different construction upon this clause of the statute of descents, holding that it prescribed transmission of inheritance lineally but not collaterally on the part of the mother of a bastard: that the Supreme court at' the time of this descent cast was the court of the highest authority having jurisdiction over the locality in which the property was; and that the decisions of that court must have the same conclusive effect in settling the law within their local jurisdiction that the decisions of this court have in settling the law of Virginia. It must be conceded that all rights of property in Alexandria county, vested according to law whilst that territory was under the j urisdiction of the United States government, must be respected. This is required as well by natural justice as by the terms of the acts of congress and of the general assembly retroceding that territory to Virginia. We should give to any adjudication by a court of competent jurisdiction therein the same binding force upon the parties to a suit, which their laws at the time imparted to such adjudications. We should generally allow to decisions of the Supreme court on questions of law arising in Alexandria county, whilst that tribunal was the local tribunal of the last resort therein, the same authoritative right in settling the law therein that we ascribe to decisions of this court in settling the law of Virginia. In fine, conceding every thing which can be claimed as giving obligatory force to decisions of the Supreme court on questions of law arising in *225 Alexandria county, yet it is impossible to hold the decision in Stevenson's heirs v. Sullivcmt, 5 Wheat. R. 207, a decision upon the law of Alexandria county. Stevenson the intestate lived in Kentucky, and died in 1796. The land descended lay in the Northwestern territory, now the state of Ohio. The suit was brought in Ohio. The state of Virginia, on the first of March 1784, by her deed of that date, ceded her territory lying north and west of the Ohio river to the United States; 11 Hen. Stat. 571; and from that time, by the express terms of the deed, her jurisdiction ceased in that quarter. The statute of October 1785 was not enacted until more than a year after the cession, and thus at no time was in force in the ceded territory. On the 13th of July 1787 the congress of the United States passed an ordinance for the government of the territory. This was before the death of Stevenson the intestate. By the second section of that ordinance a course of descents is prescribed, which excludes bastards from collateral succession to an inheritance. From this it is plain that neither the law of descents of Alexandria county or of Virginia was involved in the case before the Supreme court; that court obviously held that the law of Ohio governed the case; and as the law of Ohio was supposed to be not more favorable to the bastards than the law of Virginia, they placed a construction on the law of Virginia as showing the law of Ohio. The court decided nothing-more than this, that by the law of Ohio collateral descents amongst bastards are not permitted. Thé reference to the Virginia law was by way of argument or illustration. There is no enactment by congress, nor any authoritative exposition of the law of descents by the Supreme court, to prevent the courts of Virginia from putting our own construction of this clause of the statute of descents in Alexandria whilst under the jurisdiction of the general government. In *226 Virginia a single decision of this court on a question in the law of property long acquiesced in, or successive uniform decisions on such question, are regarded as settling the law; as establishing a canon of property. So after a construction has been put upon a statute, if the legislature re-enact such statute, the construction is regarded as having l-eceived, in some sort, a legislative sanction; as having correctly expounded the meaning of the law makers. The case of Garland v. Harrison was long since decided, and has never since been drawn in question until now; and the law thereby expounded has been re-enacted and a reference to the case placed upon the statute book. Thus stability has been imparted to the law as thereby declared, in all the forms in which it may be done. Regarding the decision of the court therein as now beyond question, I may yet be permitted to add that it rests upon a foundation so just, reasonable and consistent with the letter and spirit of the statute, that it should not be disturbed. I am therefore of opinion that Moses and Julianna succeeded to the estate of Letty.
It remains to be considered whether the right of entry has been barred by the statute of limitations. Up to the timé of Grymes’ death in 1834, the possession was held by tenants paying rent to him as tenant by the curtesy; that is, it was held in privity with, and not adversely to, the title to which Moses and Julianna succeeded. However little I might be disposed, on the evidence in the case, to regard the possession of the tenants after Grymes’ death as adverse to the lessors of the plaintiff, yet it is not material to decide whether it was so or not, because, even if adverse, it did not continue so long as to bar the right of entry.
The plaintiff filed with his declaration a statement claiming damages for rents and profits up to March 10, 1848, with interest from the end of each year for the *227 rent of such year. Whether the plaintiff, under the statute, Code, p. 562, § 30, might have filed an additional statement claiming further rents and profits accruing after March 10,1848, and up to the time of the trial, with such interest as the law allows, is not material to enquire, as no such additional rents and profits, with interest, were claimed by the plaintiff, or assessed by the jury. The damages claimed and allowed are for a tort, for the trespass and ejectment alleged, prior to the 1st of July 1S50, when the Code of 1849 became the law. The statute, ch. 177, § 14, p. 673, permits a jury to give interest on damages for tort arising after that law took effect; but leaves damages for tort theretofore committed as they formerly were; that is, bearing no interest. The usual and proper course for juries in cases of this kind has been to consider the amount of interest, and allow it as damages, but not as interest. Kegarding the allowance of interest made by the jury in this case-as mere surplusage, the case is left under the operation of the second clause of § 14, which requires judgment to be given for interest for money recovered in all cases from the date of the verdict, if no other proper time be fixed. The judgment in this case must, therefore, be for interest on the damages assessed from the 18th May 1853, the date of the verdict.
The other judges concurred, in the opinion of Samuels, J.
Judgment reversed.