Daniel, J.
There does not seem to me to be any serious doubt as to the intention of the testator in respect to the emancipation of his slaves.
The language of the main clause in the will bearing on the subject is as follows : “ The negroes loaned my wife, at her death I wish to have their choice of being emancipated or sold publicly. If they prefer being emancipated, it is my wish they be hired out until a sufficient sum is raised to defray their expenses to a land where they can enjoy freedom; and if there should *187 not be enough of the perishable property loaned my wife to pay off the legacies to Ann Lewis Howie and Georgianna Bryan, they are to be hired until a sufficient sum is raised to pay the deficiency. If they prefer being sold and remaining here in slavery, it is my wish.they be sold publicly, and the money arising be equally divided between my sister Eliza Marshall, the children or heirs of my brother Carter B. Poindexter, my nephews William C. Howie and Daniel P. Howie, and my niece Nancy Bailey.”
Here it seems to me is a plain and unambiguous tender by the testator to his slaves, of an election, at the death of his wife, to be emancipated or to be sold publicly as slaves. If they prefer to be emancipated, it is his will that after being hired out till the sums mentioned are raised, they shall enjoy their freedom. If, on the other hand, they prefer to remain in slavery, then it is his will that they remain slaves.
This view of the character of the bequest is not as I conceive affected by the subsequent clause of the will relating to the slaves. The office of that clause is, to empower the executors to sell such of them as should be refractory, and, by consequence, to exclude them from the benefits of the previous provisions in favor of all the slaves loaned to the testator’s wife. This exception to the bequest does not serve in any manner to declare or explain the nature of the bequest.
The codicil to the will does, however, I think, aid in showing that the idea of an election, by his slaves, with its consequences, was distinctly and prominently presented to the mind of the testator whilst engaged in planning and setting out the scheme of his will. For reading the codicil and the clause in the will respecting the emancipation of the slaves, together, we see that the testator, after tendering to the slaves, in plain terms, the option of being emancipated or sold publicly, proceeds not only to point out distinctly *188 what is to be the effect of their election, in each of its aspects, on their own condition, but makes the measure and shape of bequests, to other objects of his bounty, dependent upon it. In case the slaves prefer to remain'in slavery, they are to be sold, and the proceeds divided between the sister and certain of the nieces and nephews of the testator. On the other hand, if they pi’efer to be emancipated, the consequent disappointment of the legatees just mentioned, is to be compensated by a pecuniary legacy of a thousand dollars to be paid them by Jaqueline L. Poindexter, another of the testator’s nephews, and obviously one of the most favored objects of his testamentary regard.
With these views of the will before me, I cannot undertake to say that there would not be as plain a violation of the testator’s intentions in forcing emancipation and its consequences on his slaves, against their election to remain here in slavery, as there would be in withholding freedom from them, on their expressing a preference to be emancipated.
Looking to the subject matter of the bequest, it is true we may conjecture that it was pi-obably the expectation of the testator that many, perhaps most of the slaves, would elect to be emancipated; yet when we see that no provision is made in the will for the support of any of them in the strange land to which, in case of their emancipation, they were to be transported, we may as fairly suppose that it was in the contemplation of the testator that there would be some of them, especially of the aged and infirm, who would prefer to remain in their present condition.
In this aspect of the case, what warrant have we for declaring that an election by the slaves to be emancipated is not at all essential to their receiving their freedom under the will of the testator? It is conceded that the effect of such a decision would be to work an absolute emancipation of all of the slaves, *189 in spite of a choice to the contrary by any or all of them; it being admitted by the counsel, who recommends this course to us, that in such a state of things the clause in respect to the election of the slaves to remain in slavery would be wholly void and inoperative. The will would, then (according to his view of it), of itself confer the franchise, and no act of the negroes would be allowed to defeat their manumission, or to operate their disfranchisement.
We cannot adopt the course recommended, without running counter to the plain and express directions of the testator. The whole tenor of his will shows that he intended the manumission of the slaves to depend on the performance by them of the precedent condition of electing to be emancipated. We have no authority for regarding this condition as mere surplusage, and declaring the slaves absolutely emancipated. If the condition is legal and possible, we are bound, in carrying out the testator’s intentions, to allow to the slaves an opportunity to perform it. If, on the other hand, we find it to be illegal or impossible, we are equally bound to declare the bequest, dependent on its performance, void.
It is not competent for us, supposing the condition to be illegal or impossible, to pronounce, as the will of the testator, what we may conjecture he would have directed in respect to his slaves, had he foreseen the difficulties which now present themselves. Nor did we pursue any such course in the case of Osborne v. Taylor, 12 Gratt. 117. The slaves there were declared to be absolutely and unconditionally free, not because of any belief or conjecture on the part of the court that such would have been the testator’s will had he known of the illegality of the condition which he sought to annex to the bequest of their freedom; but because, having by a distinct clause declared them to be free, he could not then confer on them the capacity *190 of electing to disfranchise themselves, and assume a condition of qualified slavery.
On the supposition that an election in this case by the slaves to be emancipated, is illegal or impossible, the two cases, instead of calling for the same judicial result, furnish marked illustrations of the directly opposite legal effects of conditions precedent and conditions subsequent. There the election by the slaves to assume a state of qualified slavery, was essential to the defeat or destruction of the bequest of freedom; whilst here the election by the slaves to be emancipated is essential to give any force or validity whatever to the bequest. We are thus led necessarily to the enquiry, whether the condition precedent in this case be legal and possible, or otherwise.
Is the condition one which the slaves have the legal capacity to perform ?
To answer the question, it is essential to institute a brief enquiry as to the true condition here of the class of persons to which they belong.
Chancellor Kent, in the second volume of his Commentaries, at page 253, in speaking of the laws of the southern states on the subject of domestic slavery, says, “ They are doubtless as just and as mild as is deemed by those governments to be compatible with the public safety, or with the existence of that species of property; and yet in contemplation of their laws, slaves are considered, in some respects, as things or property, rather than persons, and are vendible as personal estate. They cannot take property by descent or purchase, and all they find and all they hold belongs to the master. They cannot make lawful contracts, and they are deprived of civil rights. They are assets in the hands of executors for the payment of debts, and cannot be emancipated by will or otherwise, to the prejudice of creditors. Their condition is more analogous to that of the slaves of the ancients than to *191 that of the villeins of feudal times, both in respect to the degradation of the slaves, and the full dominion and power of the master.”
In the case of Emerson v. Howland, 1 Mason’s R. 45, which was a suit brought by a master to recover wages for a mariner slave who by his own consent had been discharged from service, Judge Story, in delivering an opinion sustaining the action, uses the following language: “ The slave could not consent to be discharged. The contract was entered into by the owner, in Virginia, and must be construed with reference to the lex loci contractus. In Virginia slavery is expressly recognized, and the rights founded upon it are incorporated into the whole system of the laws of that state. The owner of the slave has the most complete and perfect property in him. The slave may be sold or devised or pass by descent, in the same manner as other inheritable estate. He has no civil rights or privileges. He is incapable of making or discharging a contract, and the perpetual right to his services belongs exclusively to the master.”
Judge Tucker, in his notes to his edition of Blackstone, vol. 2, p. 145, after defining social rights to be such as appertain to every individual in a state of society, without regard to the form or nature of the government in which he resides, proceeds to say that they include all those privileges which are supposed to be tacitly stipulated for, by the very act of association, such as the right of protection from injury, or of redress for the same, by such an action, and the right of acquiring, holding and transmitting property; that in all civilized nations all free persons, whether citizens or aliens; males or females; infants or adults; white or black, of sound mind, or idiots and lunatics, have their respective social rights according to the customs, laws and usages of the country. “ Slaves only (he continues), where slavery is tolerated by the laws, are *192 excluded from social rights. Society deprives them of personal liberty, and abolishes their right to '’property; and in some countries even annihilates all their other natural rights.”
And in his Appendix to the same volume, p. 55, after remarking that the Roman lawyers look upon those only as persons who are free, putting slaves into the rank of goods and chattels, he says, that the policy of our legislature seems conformable to that idea. And he proceeds, “ Slavery (says Hargrave) always imports an obligation of perpetual service, which only the consent of the master can dissolve.” And “ the property of the slave is absolutely the property of his master, the slave himself being the subject of property, and as such saleable and transmissible at the will of the master.”
To the like effect are the remarks of Chancellor Dessausseure in the case of Bynum v. Bostick, 4 Dess. R. 266. He there expresses the opinion that the condition of the slaves in this country is analogous to that of the slaves of the ancient Greeks and Eomans, and not that of the villeins of feudal times. That by the civil law which, in that regard, is the law of this country, they are incapable of taking property by descent or purchase. And that they are generally considered not as persons, but things.
In the case of Girod v. Lewis, 6 Martin’s R. 559, it is asserted that slaves have no legal capacity to assent to any contract: that whilst with the consent of the master they had the moral power to enter into such a connection as that of marriage, the marriage, whilst they remain in a state of slavery, could be productive of no civil effect, because slaves are deprived of all civil rights. And in Graves v. Allen, 13 B. Monr. R. 190, it is declared that whilst they may, with the assent of their masters, have the physical use and enjoyment of property, they are incapable of becoming the *193 legal owners thereof; and that any devise to them except that of freedom, is void. See also Roberson v. Roberson’s ex’ors, 21 Alab. R. 273; Neal v. Farmer, 9 Geo. R. 555; Skrine v. Walker, 3 Rich. Eq. R. (S. C.) 269; Thomas v. Palmer, 1 Jones’ Eq. R. (N. C.) 249; Dred Scott v. Sanford, 19 How. R. 407, 475.
The general principles declared and illustrated by these authorities, have been fully recognized by this court, whenever it has had occasion to make any express declaration of opinion respecting them. The law empowering masters to manumit their slaves by deed or will, it is true, has on various occasions been most liberally interpreted in favor of the latter. Yet the court has uniformly refused to recognize any capacity in the slave to contract with his master for his manumission. Sawney v. Carter, 6 Rand. 178; Stevenson v. Singleton, 1 Leigh 172. And has also repeatedly denied the validity of bequests in which it has been sought by masters to clothe their slaves, whilst remaining in a state of slavery, with certain privileges and immunities, such as being allowed to remain in the service of particular persons, and receive wages for their labor, or to live on certain lands, working them, and enjoying the profits, freed from all obligation to render service to persons under whose care and protection they were left. As in Rucker’s adm’r v. Gilbert, 3 Leigh 8; Wynn v. Carrell, 2 Gratt. 227; and Smith’s adm’r v. Betty, 11 Gratt. 752.
It is argued, however, that the precise question under consideration has been decided by this court in the cases of Pleasants v. Pleasants, 2 Call 319, and Elder v. Elder’s ex’or, 4 Leigh 252.
It is true, that in each of the wills of John and Jonathan Pleasants, out of which the controversy in the first mentioned of these cases arose, expressions are used, which, if taken alone, would indicate a desire on the part of the testators that the wishes of *194 the slaves should be consulted in respect to their manumission. But when we look to the general tenor and leading purposes of the two instruments, it is left extremely doubtful whether either of the testators designed that the operation of the bequests should depend in any measure on the choice of the slaves. No such question seems to have been presented by the pleadings ; nor does there appear to be, either in the extended arguments of counsel, or in the opinions of the judges (delivered at much length), or in the decree of the court, any reference whatever to the option of the slaves. Any authority to be deduced from the case, as bearing on the question in hand, would, therefore, necessarily be the result of presumption or conjecture, and entitled, I think, to little if any weight.
In the case of Elder v. Elder's ex'or (it must be admitted), the will, to be construed and executed, does, in all its features disclosing a purpose on the part of the testator to leave the manumission of his slaves to their election, bear a very close resemblance to the will in the present case. The case, however, as an authority, is, I think, obviously open to some of the same criticisms that apply to Pleasants v. Pleasants. For it does not appear from the abstract of the bill, that the complainant raised any question as to the capacity of the slaves to make an election ; the gravamen of his allegations being, that the slaves, conditionally emancipated by the will, had never elected to go to Liberia; but that on the contrary, the executor having fully explained the will to them, and their rights under it, they had declared they would not go to Liberia, and preferred to remain in Virginia in slavery; and that they had remained here for nearly two years since the testator’s death : nearly a year beyond the expiration of the period within which they were, by the terms of the will, to make their election. It will be seen, too, that, during the progress of the cause in *195 the court below, the complainant consented to an order of the chancellor appointing commissioners to examine the slaves, and to ascertain from each individual, and report to the court, whether they were, severally, willing to go to Liberia.
Of the arguments of the counsel, in this court, we have no report, and we are therefore without the means of ascertaining, except from intimations thrown out by the members of the court in the course of their several opinions, on what grounds it was sought to reverse the action of the chancellor. I think, however, that It,may be fairly deduced from the opinions of the judges, that the stress of the case was on the questions, whether the testator could emancipate his slaves by-directing them to be sent to Liberia, and whether, according to a fair interpretation of the will, the slaves were bound to make their election within twelve months after the decease of the testator. It was to these questions that the court mainly addressed their attention and remarks. I have failed to discover any observation in any one of the opinions of the judges, from whieh to raise the inference that the distinct question of a want of legal capacity in the slaves to make an election at all, was a matter of discussion before this court. In the state and shape in which the controversy apparently stood before this court, it might perhaps be going too far to say that the question could not have arisen. But in view of the circumstances whieh I have adverted to, it seems obvious to remark that for this court to have decided the case adversely to the negroes, on the ground that they had no legal capacity to make an election, would have been, to place itself seemingly in the umgraeious attitude of being astute to set up an objection to the claim of freedom, which the appellant was not insisting on, and which, from his bill, as well- as from his *196 course ia the eourt below, he did not appear disposed to raise.
From these considerations, whilst there are-remarks in the opinions of some of the judges showing that there did not appear to them to be any thing illegal or impossible ia the condition of an election by the slaves, the decision as an authority would yet seem to me to come far short of occupying the position on which it would have stood had it appeared that the question had been distinctly presented to,, and adjudged by, the eourt.
Therefore, whilst entertaining the highest regard and veneration for the great learning, ability and general worth of the judges who decided that ease, 1 cannot recognize the decision as imposing, on the exercise of our own judgments, those restraints which could result properly alone from a decision in which the- question appeared to have been folly considered and unequivocally adjudged.
Nor do I think we should be deterred from a free examination of the question by apprehensions, lest, in. the event of our coming to a conclusion at variance-with the supposed authority of that case, we might inflict possible injury on fiduciaries and their securities, in instances where (it is suggested), relying on such authority, executors and administrators may have assented to like bequests. For I do not think that the-ease has ever been regarded by the profession as an authority, on- the force of which the definitive settlement of the question sould be safely predicated. Indeed, in the present case the Circuit eourt has so far disregarded, the authority of Elder v. Elder as to declare the negroes free, without first instituting the proceedings that were had, i-n that case, to ascertain their choice; and their own counsel, in the argument here, have widely differed among themselves- in respect to> *197 the necessity or propriety of any such proceedings. And I should suppose that the instances (if any) are extremely rare in which executors, acting under wills with such peculiar features, have failed to protect themselves, by seeking the advice of the courts, before committing themselves to the hazardous and irremediable step of assenting to the bequests of freedom.
Under these circumstances, I have conceived it to be my duty to regard the question as one to be tested by the general and well acknowledged principles pertaining to the subject, and not as one controlled by the influence of a special adjudication.
And when we so treat the question, it seems to me that there can be no longer any serious difficulty as to its proper solution.
When we assent to the general proposition, as I think we must do, that our slaves have no civil or social rights; that they have no legal capacity to make, discharge or assent to contracts 5 that though a master enter into the form of an agreement with his slave to manumit him, and the slave proceed fully to perform all required of him in the agreement, he is without remedy in case the master refuse to comply with his part of the agreement; and that a slave cannot take any thing under a decree or will except his freedom; we are led necessarily to the conclusion that nothing short of the exhibition of a positive enactment, or of legal decisions having equal force, can demonstrate the capacity of a slave to exercise an election in respect to his manumission.
Any testamentary effort of a master to clothe his slave with such a powTer, is an effort to accomplish a legal impossibility.
No man can create a new species of property unknown to the law. No man is allowed to introduce anomalies into the ranks under which the population of the state is ranged and classified by its constitution *198 and laws. It is for the master to determine whether to continue to treat his slaves as property, as chattels, or, in the mode prescribed by law, to manumit them, and thus place them in that class of persons to which the freed negroes of the state are assigned. But he cannot impart to his slaves, as such, for any period, the rights of freedmen. He cannot endow, with powers of such import as are claimed for the slaves here, persons whose status or condition, in legal definition and intendment, exists in the denial to them of the attributes of any social or civil capacity whatever.
No conflict with these views is exhibited, by showing that the master may make his slave his agent, and bind himself to others by his acts. The only analogy between the position of a slave and that of a freeman employed in a like capacity is to be found in the fact that the slave and the freeman are both, for the occasion, the mere creatures of the master, and in the further fact that the power given is, in either.case, revocable at his pleasure.
The resemblance between the condition of the slave and freeman, for the time, grows not out of the fact that the master has invested the slave, or recognized him as invested, with the characteristic powers of a free person, but out of the fact that the freeman has chosen to subject his own conduct and actions, for the occasion, to the will and control of another.
The agency of the slave, in truth, instead of affording any argument in behalf of the existence of his social or civil rights, is but an instance or illustration of the complete dominion of the master; of his entire control over all the powers and faculties of his slave ; and of his right, consequently, to use him as an instrument or medium through which to make or execute contracts with third persons.
A master contemplating the manumission of his slaves might, no doubt, first ascertain their wishes on *199 the subject, and if he pleased, then proceed to shape his course accordingly ; and it could form no objection to a deed or will emancipating them, should it appear on the face of the instrument that the act of manumission was in conformity with their choice. But by establishing this proposition, the counsel for the appellees do not, it seems to me, reach any ground on which to found an argument in favor of the validity of the bequest in this case. In the case supposed, the act of emancipation is executed, complete and ended. It neither adds to, nor detracts from, its force that the master, in the execution of the instrument, consulted the wishes of the slaves. The operation of the instrument, there,, is in no wise dependent on any thing that the slaves have done or are to do in the matter. But in the case before us, the operation of the will, as an instrument of emancipation, is made to depend on the choice of the slaves. In the case supposed, the master has fully manumitted his slaves. In the case before us, the master has endeavored to clothe his slaves with the uncontrollable and irrevocable power of determining for themselves whether they shall be manumitted. And in so doing, he has, I think, essayed the vain attempt to reconcile obvious and inherent contradictions.
In considering whether the legislature, in authorizing a master to manumit his slaves by will, could have contemplated, as valid instruments of emancipation, wills such as the one before us, a view of the many serious difficulties which, from obvious considerations, would most probably grow out of and attend the whole subject of an election by slaves, especially by such of them as might be laboring under the disabilities of infancy, idiocy or lunacy, furnishes to my mind a strong argument in favor of the negative of the proposition. It is difficult to suppose, in the opposite view, that the legislature would not have anticipated such difficulties, and made provisions for the regulation of the subject, instead of embarking the chan *200 eery courts, without guide, upon a new and extensive jurisdiction, which would needs be fruitful in litigation of the most perplexing, if not mischievous character.
On the whole, it seems to me that the provisions of the will respecting the manumission of the slaves, are not such as are authorized by law and are void, and consequently that the Circuit court erred in declaring the slaves and their increase to be free at the death of the life tenant.
In the absence of any proof or statement showing specifically the several kinds and descriptions of personal and perishable property which it is alleged were received by Mrs. Poindexter, and not returned or accounted for at her death, it would, I think, be premature to attempt to prescribe the rules by which to measure the extent of the accountability of her representative for such property, inasmuch as the rules which would apply to certain articles of such property, might not be properly applicable to others.
The views which I have expressed in regard to the bequest respecting the manumission of the slaves, leads to questions which thence arise between the next of kin and some of the legatees of the testator. But as none of these questions are distinctly and specifically raised in the bill, as it does not clearly appear that all the parties who may have an interest in these questions are now before the court, and as the case must necessarily go back, it seems to me it would be most proper to refer these questions also to the Circuit court, where all who have an interest in the subject, if not already before the court, can be made parties, and allowed an opportunity of presenting to the court more distinctly the several questions bearing on their respective interests.
Moncure, J.
I think the bequest contained in the will of John L. Poindexter, that the negroes loaned to *201 his wife for life should at her death “ have their choice of being emancipated or sold publicly,” is a valid bequest, and emancipated them in futuro, upon a condition precedent.
Whether a master should have power to emancipate his slave or not, is a question which addresses itself to the legislative, and not the judicial department of the government. It was answered by the legislature by the act of 1782, giving the right to emancipate by will or by deed. That act, substantially, has ever since remained, and yet remains, in full force; modified only by the act of 1806, requiring slaves thereafter emancipated to leave the state.
That a master may emancipate his slaves, to take effect in futuro ; as for instance, after the death of his wife; has been repeatedly adjudged by this court, and may now be considered as the settled law of the land.
That a master may emancipate his slaves upon a condition precedent, if there be nothing unlawful in the condition, is a proposition which will not be denied : as for instance, if his wife die without issue living at her death. This would not only be a lawful, but a reasonable condition, having for its object a provision for the issue, but for which the emancipation would be absolute. But no condition however unreasonable or even capricious would, on that account merely, be unlawful.
A master may emancipate his slaves against their consent. Why may he not make such consent the condition of emancipation ? There seems to be nothing in the policy of the law which forbids his doing so. He may certainly, in his lifetime, consult the wishes of his slaves, and emancipate them or not accordingly. Why may he not direct his executor to consult their wishes, and emancipate them or not accordingly? Is not the one as much opposed to the policy of the law as the other? the consultation by *202 the master, as much as the consultation by the ex- “«‘or’
It may be said that one is an executed, and the other an executory act of emancipation. But both are, in fact, executed acts. Both of them, so to sneak, con- . , 1 vey an estate or interest — a right to freedom ; the one an absolute, the other a conditional right. The latter is as much an executed act as if the condition were wholly independent of the wishes of the slaves.
If the slaves were wholly incapable of making a discreet choice, and could merely guess what was best for them, there would be nothing in that incapacity which would make the condition unlawful. As before stated, a condition is not unlawful, merely because unreasonable or even capricious.
But slaves have some capacity to choose, though it may, generally, be very weak and imperfect. They are responsible for their criminal acts; and may incur, and have to suffer the heaviest penalty of the law. The moment they become free they are legally capable, without any increase of intelligence, of making contracts, buying and selling property, and doing other acts which require the exercise of mental faculties. And as the law now is, they may, by their own choice, return again to slavery. Slaves have certainly feelings and wishes which the master may be willing to consult in regard to their emancipation. To do so, is not to create that middle state between slavery and freedom, which is unlawful. It is merely to propound a question to a slave requiring a categorical answer. If he wishes to be free, he is made a freeman in an instant; but is made so by the act off his master, whether that act be executed before or after the expression of his wish ; provided it be executed according to law. There is not a particle of time intervening between his slavery and his freedom ; and so no particle of time in which he occupies a state between the two. *203 The dominion of a master over his slaves (as over his other property) may be exercised not only by an act which is to operate during his life, but by an act which is not to operate till after his death; and that dominion embraces the power of emancipation. He may emancipate them by deed or by will — in presentí or in futuro — absolutely or conditionally. If he attempt to violate the policy of the law, by creating a mixed state of slavery and freedom, his act will be void: or if he violate a rule of law, by annexing to a gift of the slaves a condition which is repugnant to the gift, the condition will be void. And his act of emancipation, whether absolute or conditional, in presentí or in futuro, by deed or by will, is in subordination to the claims of creditors, and to the obligation of the master to indemnify the community against the expense of slaves likely to become chargeable.
His legatees, certainly, cannot complain of his act or the manner in which he has seen fit to exercise it. They can claim only what he has chosen to give them ; and cannot complain that he has given them his slaves only on condition that they prefer to remain in slavery. It was his to give them absolutely or conditionally; and it is theirs to refuse or accept them as given. There is nothing in the policy of the law which requires them to claim the slaves against his will. They certainly may, if they choose, give effect to it. Why should they not be compelled, if need be, to do so? Why should they be permitted, contrary to the general rule, to claim under and against the will ? The intention of the testator, if lawful, must prevail. It is a law to all who claim under his will. They must do all they can to give effect to it.
It is argued, that slaves have no civil rights or legal capacity, and cannot therefore elect between freedom and slavery, though authorized to do so by their master. The premises of this argument are certainly true, *204 at least as a general rule, but the conclusion is, I think, unsound. The fallacy of the argument (if I may be allowed to say so), consists in supposing that to make such an election would be to exercise a civil right or capacity. It is admitted that slaves are capable of receiving freedom, if conferred in the mode prescribed by law. It must also be admitted that it may be conferred conditionally. It was so conferred in the cases of Pleasants v. Pleasants, 2 Call 319; Elder v. Elder's ex'or, 4 Leigh 252; Dawson v. Dawson's ex'or, 10 Id. 602, and Hepburn, &c. v. Dundas, &c. 13 Gratt. 219. The right to confer it absolutely, which the law expressly gives, includes the right to confer it conditionally. The only question is, Whether such condition may be the willingness of the slave to receive his freedom. Why may it not ? Slaves emancipated absolutely, still have an election between freedom and slavery. They may become slaves again under the provisions in the Code, p. 466, § 1, and p. 746, § 26; or under the act of February IS, 1856, Sess. Acts, p. 37. Why may not the master give them such an election directly, instead of giving it to them indirectly, by first making them free? Why should he be compelled to lose his property in such of his slaves as prefer to remain so, in order that he may give freedom to such as prefer it? It is said that a slave emancipated by an election given him by his master, would become free by his own act, and not by the act of his master. But this is not so. A slave can become free only by the act of his master; and the act must be done in a certain prescribed mode. When the act has been done in that mode, it may be made to depend on the willingness of the slave as well as upon any other condition. And whether made to depend on that or any other condition, it is the act of the master, and not the happening or performance of the condition which confers the right to freedom. *205 The agency by which the condition is performed, is constituted by the master; and such performance is thus, in effect, his own act. There is nothing in the relation of master and slave, nor in the condition of slavery, which can prevent a master from adopting the agency of his slave for such a purpose. He can do so on the same principle on which it is admitted he may make his slave his agent for other purposes.' Certainly nothing is better settled than that a slave cannot make a valid contract, even for his own freedom; and cannot enforce the execution of a promise of his master, even though it be to confer freedom upon him, and though the consideration on which it was made has been fully performed on the part of the slave. But it is equally well settled that a slave may avail himself of an act of emancipation duly executed by his master, whether such emancipation be absolute or conditional.
But if it can properly be said, that to make such an election would be to exercise a civil right or capacity, it would be as a mere incident to a capacity which is expressly given by law. A slave, as before stated, is certainly capable of receiving his freedom. And, if it be conferred in the mode prescribed by law; that is, by deed or will duly executed and recorded, he may propound such deed or will for probate, and may appeal from a sentence against him. He may sue in forma pauperis for his freedom, and may resort to a court of equity for relief when he has no adequate remedy at law. It is as competent for a slave emancipated on condition that he elects to be free, to make such election, as it is for a slave absolutely emancipated to propound the deed or will for probate, appeal from the sentence, or sue for his freedom. Such right of election is incident, as such remedies are incident, to the legal capacity of the slave to receive his freedom. *206 If this were a new question, therefore, and especially if it be conceded, as it now must be, that emancipations in futuro are lawful, I would think the condition lawful and the emancipation valid in this case.
But I regard the question as res adjudícala. Elder v. Elder, I think, has decided it. I would feel myself bound by that decision, even if I doubted its soundness. It is a case’ of the highest authority, having been argued by very able counsel, and having been decided by a unanimous court of four of our ablest judges, Tucker, Brooke, Cabell and Carr, Judge Creen being-absent from sickness. It was decided in 1833, a quarter of a century ago, and has ever since been regarded as a binding authority. On the faith of it counsel have advised, testators have made their wills, courts have construed them, and executors have carried them into effect. To disregard it now, and decide otherwise, may be attended with the greatest evils. The same reasons which are said to require us to disregard that case, seem equally to require us to disregard all the cases which decide that emancipations in futuro are lawful; and thus the whole law would be unsettled in regard to the emancipation of slaves.
But it is said that the question was not raised nor decided in Elder v. Elder; that the order in that case appointing “ commissioners to examine privily and impartially all the slaves of the testator’s estate, and to ascertain from each and report to the court, whether he or she was willing to go to Liberia,” was made by consent of parties; and therefore that the question is not res adjudícala. The bill which was filed by the residuary legatee, alleged that the slaves conditionally emancipated by the will had never elected to go to Liberia; but that, on the contrary, the executor having fully explained the will to them, and their rights under it, they had declared they would not go to Liberia, and preferred to remain in Virginia in slavery; *207 and that they had remained here for near two years since the testator’s death. The executor, in his answer, stated that the other persona! estate of the testator being inadequate to the payment of his debts, he had hired out the slaves for that purpose, and had not yet given them their election, though he had explained their rights to them, and did not doubt that when they should be allowed to make their election, they would prefer to go to Liberia. In this state of the pleadings the consent order was made. The commissioners reported that all of the slaves except one preferred to accept their freedom and go to Liberia; and the court decreed accordingly. The argument of the case in this court is not reported; and we can only infer what it was from the opinions of the judges. It is reasonable to infer that among the points argued, were those which were decided. It was decided, among other things, that such of the slaves as preferred to go to Liberia were effectually emancipated; and that it was unnecessary, to perfect their title to freedom, that they should elect to go within twelve months after the testator’s death, provided they made such election when it was offered to them ; or that the Colonization society should agree to defray the expenses of sending them; provided any person should agree to do so. It appears from the opinion of President Tucker, that these points were argued by counsel. It cannot be said with propriety that they did not arise in the case 5 or that it was improper for the court to decide them ; or that the fact that the order before mentioned was by consent, affected the decision. If the slaves really had been unwilling to go to Liberia, as the bill alleged, a report of that fact by the commissioners would have put an end to the case; and therefore the plaintiff consented to an order appointing commissioners to ascertain the fact; but he did not intend thereby to waive any right he might *208 have to the slaves, even though they might be willing to go to Liberia. Nor did the order have that effect. Carr, J. said, “In the construction of wills, we are to find out the meaning, the intention, the will of the testator; and unless that violates some principle of law, it must be carried into execution.” He thought the intention plain in the case, and that it did not violate any principle of law. Cabell, J. said, “ The intention of the testator to emancipate his slaves, is too evident to require argument; and it is equally clear that there is nothing illegal in the mode which he has adopted for the execution of that intention. Slaves may be emancipated by deed or will, at the pleasure of their owners; but they forfeit their freedom, unless they remove, within twelve months, beyond the limits of the commonwealth. It can therefore be no objection to the emancipation in this case, that the testator has directed it on the condition of their willingness to go to Liberia.” Brooke, J. concurred. Tucker, P. said, “ The first questions in this case turn upon the intention of the testator, and the legality of that intention. Of the intention, I think there can be no reasonable doubt.” “ As little doubt exists of the legality of this intention. The slaves were not to be free until they should be sent to Liberia; and they were not to be sent there against their consent. It is not perceived that there is any thing in the policy of the law, as there certainly is not in its statutory provisions, which forbids an emancipation by transportation to a free colony.” None of the judges seem to have had any doubt upon the question, whether the conditional emancipation of the slaves was valid. Their decision of that question seems to be in accordance with the construction which has uniformly been put upon the act of 17S2, and acquiesced in ever since its passage.
In Pleasants v. Pleasants, 2 Call 319, the wills of John and Jonathan Pleasants, which were the subjects *209 of controversy, were made before the passage of that act, when it was not lawful to emancipate slaves in this state j and the case was decided shortly thereafter. The will of John was, that his slaves should be free if they chose it, when they arrived at the age of thirty years, and the laws of the land would admit them to be set free without their being transported out of the country, &c. The will of Jonathan was, that whenever the laws of the country would admit absolute freedom to them, his slaves should, on their coming to the age of thirty years, become free, or at least such as would accent their freedom. The court, consisting of Judges Pendleton, Carrington and Roane, unanimously held that the slaves were entitled to their freedom. Nothing was said in the case about the right of election given to the slaves. The great question was, Whether the doctrine of perpetuities and executory limitations applied to the case; and whether, according to that doctrine, the bequest of freedom was limited on a contingency too remote ? It did not occur to the counsel or the court that an election between freedom and slavery could not be given to slaves under the act of 1782. If it had, it is incredible that the objection would not have been taken'or suggested by some of them. It is said, that the objection was not taken because the emancipation was considered to be absolute. It can hardly be supposed that the counsel for the claimants of the slaves would have admitted, without a question, that the emancipation was absolute, if it had been considered that its validity0 depended upon thaU An order to take the election of the slaves was doubtless not applied for, because it was known that all would elect their freedom 5 especially as, by the act of 1782, they were not required to leave the state. I regard Pleasants v. Pleasants as a case of great importance on the question under consideration. It involved a large amount of pro *210 perty, and the freedom of a great many negroes. It was argued by very able lawyers, and decided by very eminent judges, who had the best opportunity of knowing the meaning and policy of the act; and it may almost be considered as a contemporaneous exposition thereof. No subsequent decision of this court has impaired the authority of the case; nor has the doctrine settled by it been changed by subsequent legislation; though there have since been several general revisions of our laws, and two conventions to amend our constitution.
That case was followed by Elder v. Elder, in which the question of the right of election was more distinctly presented by the will, and raised by the pleadings and proceedings, and in which, as we have seen, the most confident opinions- were expressed by the judges in affirmance of the right.
Elder v. Elder, in its turn, was followed by Dawson v. Dawson's ex'or, &c. 10 Leigh 602, in which the testator directed all his slaves to be emancipated and sent to a country where slavery is not tolerated, if, within twelve months, they should elect to be emancipated on these terms; otherwise to be sold. It was tacitly conceded by all parties in the case, and by the court below and this court, that the right of election existed. The matter directly in controversy was the right to the Bell-Air tract of land, which by the codicil was given to “Benjamin Dawson, for the equitable support and maintenance of the slave population thereon.” Benjamin Dawson claimed under the codicil an absolute estate in the land and slaves thereon. The court below decided that the codicil *gave him only the use thereof, in trust for the support and maintenance of the slaves during the interval of twelve months or longer, which might elapse between the death of the testator and the election of the slaves; but that nevertheless, as the slaves were not yet freed *211 men, and would not be until they so elected, they ■therefore had no capacity to enforce against Dawson the trustee any accountability over and above their maintenance^ and he was entitled to all the profits beyond, discharged of the trust, namely, the use of the Bell-Air estate until the slaves thereon should make their election- This court, consisting of Tucker, Brooke and Cabell, unanimously affirmed the decree. In doing so, they must have affirmed the validity of the conditional emancipation of the slaves; for otherwise the trust created for their .support would have been void, and Benjamin Dawson could have had no interest in the Bell-Air estate. The most that can be said against the authority of the case is, that the question as to the validity of such an emancipation was not directly raised. The plain reason why it was not is, that neither the parties nor the counsel nor the court seem to have entertained any doubt upon the question. And this shows how uniform and universal has been the ©pinion which has prevailed upon the subject.
The principle thus recognised, affirmed -and acted on an Elder v. Elder's ex'or, and Dawson v. Dawson's ex'or, has never since been questioned in this court, nor changed by legislation; though there have since been, besides many annual sessions of the legislature, one .general revision of our laws, and one session of a convention to amend the constitution.
If public opinion has undergone any change as to the policy or .propriety of authorizing masters to emancipate their slaves, ©r to emancipate them in futuro or ¡upon condition, such change must develop itself in the action of the legislature, and not of the courts, whose business it is jus dicere, non jus dare, to expound the Saw as it is written and settled, and not as it ought to be, or as it may be supposed that public opinion would ¡have it to b.e-
*212 There are certainly difficulties surrounding the subject of emancipations depending upon the choice of slaves. Who are to choose for such as are of too tender years to choose for themselves ? is a question which it is difficult to answer j at least, to give an answer which will apply to all cases, or even as a general rule. But these difficulties are not of themselves sufficient to prevent the court from administering the law, if it can possibly do so. They were overcome in Elder v. Elder, and may be, perhaps, in most cases. There is nothing to indicate that they cannot be overcome in this ease, 'as they were in that. If in any case they cannot be overcome, the intention, of course, must fail of effect. But whenever they can, they ought to be overcome; ut res magis valeat quam pereat» Whenever the law authorizes an act to be done, and a party bona fide endeavor to do the act according to law, the court should endeavor to effectuate Ms intentions.
The will in this case was written in November 1835, two or three years after the decision of Elder v. Elder, and probably with that case before the draftsman, or in his mind. But for that case, the testator might have emancipated the slaves absolutely. He was willing to do so, but did not wish to force freedom upon them against their will, and therefore gave them their choice, as that case decided he might lawfully do. Ought we now to frustrate his will, and award the slaves unconditionally to those to whom he gave them only on condition that the slaves reject the boon of freedom which he offers them ? I think not.
I am also of opinion that the increase of the slaves born during the life of the testator’s wife, are entitled to the benefit of the. bequest. All the residue of his property, including negroes, is loaned to the wife for life. The issue of these negroes born during her life, are part of his property and part of the negroes loaned *213 to her for life. The choice of being emancipated or \ sold is given to “the negroes loaned his wife, at her \ death,” embracing of course, I think, the said issue. This construction seems to be sustained by many decisions of this court, which I need not cite.
I do not think that the clause directing his executor to sell any of the slaves loaned his wife, if they should prove refractory or hard to manage, affects the case in regard to such of the slaves as remained unsold at her death. This clause was inserted for the benefit of the wife, and to insure the good conduct of the slaves. Any of them might have been sold for misconduct during her life, and such would of course have been excluded from the number of those to whom the choice was to be offered at her death. But as to those who then remained unsold, the clause had performed its function, and they stood as if it had not been inserted in the will.
In regard to the other questions involved in this case, I concur with the majority of the court.
Allen, P. and Lee, J. concurred in the opinion of Daniel, J.
Samuel, J. concurred in the opinion of Moncure, J.
Judgment reversed.