DANIEB, J.
The question, which it seems to me ought to be disposed of first, is that raised by the fifth assignment of error, to wit, whether all the proper parties to the suit are before the court. The grandchildren of William Hepburn the testator, it is insisted, took under his will such an interest in the real estate in controversy as entitled them to be heard in answer to any bill seeking its sale. The clause of the will by which this interest is supposed to be conferred, is as follows:
“I give unto Moses the son of Esther aforesaid, the houses and lots where I now live (one of the aforesaid lots I bought of Vfilliam Herbert junior, trustee for the creditors of Robert Conway, and the other I bought of Joseph Manderville), together with my fishing shore, during his natural life, and to his children if he should have lawful issue; if not, then I give the said lots and ’‘'fishing shore at his decease to my grandchildren equally and their heirs forever.”
The will bears date the 28th February 1817, and appears to have been admitted to probate on the 26th of May 1817. At the date of the will Moses Hepburn had no children; indeed,, according to the statements of the bill, his marriage did not take place till about the year 1827. Thei'e are, as appears from the recoi'd, five children, the issue of that marriage. In this state of things, in order to come to the conclusion that the grandchildren of the testator mentioned in the clause in question, have still an interest in the devise, we should have to construe said clause as meaning, that the vesting of the first remainder was dependent on the double contingency of Moses Hepburn having children, and of their (or some of them) surviving him. This, it seems to me, we cannot do. The law leans in favor of the vesting of estates; and if, therefore, the meaning of the will was doubtful, we should, instead of seeking for a construction that would postpone the vesting of the estate, and impart to the remainder an additional feature of contingency, incline rather to that construction which would regard the remainder as vesting on the happening of the earliest contingency, to wit, the coming into being of the children of Moses Hepburn. There is, however, no reasonable doubt as to the intention of the testator; the plain and natural effect of the language which he has employed, is to give the estate to Moses for life; remainder to his lawful children, if he shall have any, with an alternative remainder to the grandchildren of the testator, dependent on Moses’ dying without having had any lawful children. At the death of the testator, both of the remainders wei'e contingent; and until the birth of the first child of Moses Hepburn, the grandchildren had an interest in the subject of the devise: But on the happening of that event, the first '’''remainder vested, and the second or alternative remainder was thereby defeated. Doe v. Perryn, 3 T. R. 484; Fearne on Remainders 312; Right v. Creber, 5 Barn. & Cres. R. 866; Hannan v. Osborn, 4 Paige’s R. 336; Doe v. Provost, 4 Johns. R. 61; 4 Kent’s Comm. 234, and note.
These authorities all show, that in cases of the kind the remainder becomes vested in the children of the life tenant as they severally come into being, subject to open and let in afterborn children, and that the remainders over are gone; and that if any of the children die in the lifetime of the life tenant, the estate descends to their heirs.
It is clear, therefore, as I conceive, that there was no error in the failure of the Circuit court to make the grandchildren of the testator parties to the suit; unless indeed such error arises out of the court’s dismissing the petitions of the appellant and the petition of Thomas Dundas and others, so far as they were founded on the allegations that Moses Hepburn is a slave; that his marriage was illegal; and that his children are bastai'ds; and that consequently, the said last mentioned petitioners are entitled to or interested in the lands sold. I am satisfied that the course pursued by the court in that particular was coi'rect. It will be seen, that in the petition of the appellant, filed in February 1854, he states, that since paying a portion of the purchase money of the property in question, he had accidentally learned, from the result of a suit recently decided by the Circuit court of Alexandria (the court by which the decree under consideration was rendered), that it was very doubtful whether he could get any title to the land he had purchased, *959 by reason of the said Moses Hepburn being a slave, and his supposed children being, in the eye of the law, bastards, and consequently unable to take any thing under the will of the testator William Hepburn. "We have before us no record of the suit above referred to, nor any account of, or statement in respect to it, further than what is contained in the petition. We may very reasonably conjecture that the reference is to the suit of Hepburn v. Dundas, which was decided by this court, upon an appeal in January 1856, and is reported in 13 Gratt. 219. Were we at liberty to look into that case, in passing upon this, we should there see that all the grounds on which the petitions were founded, so far as they relate to the matter in hand, had been entirely removed before the Circuit court made its order dismissing the petitions. In that case, the question whether Moses Hepburn was a free man or not, was distinctly presented to, and decided by this court in his favor. The case was an action of ejectment brought by Moses Hepburn and his sister Juliana, claiming to recover a certain tenement of James H. Dundas, as brother and sister and heirs of Hetty, a free woman of color, to whom said tenement had been devised by the will of William Hepburn. Opon a demurrer to the evidence, the Circuit court had rendered a judgment, at its March term in 1853, in favor of the defendant. From this judgment an appeal was taken to this •court in 1854; and at its January term 1856 (as before stated) this court reversed the judgment of the Circuit court, and rendered judgment for the i>lainliifs in error; thus affirming the freedom of Moses and Juliana, and their right to take by descent from their sister.
At its May term 1856 the Circuit court made its order in this case, dismissing the petitions; the court and the parties having doubtless awaited the decision of this court in the case of Hepburn v. Dundas. Could we, therefore, properly regard the record in that case as a part of the record in this, all difficulty as to the question in hand would be at an end. As, however, neither the parties nor the Circuit court have made *auy such reference to said record as to identify it, and show conclusively to this court that it was relied on, and acted upon in the court below, we are not, I apprehend, at liberty to treat it as a part of the record in this case, and have therefore to pass upon the action of the Circuit court in respect to the petitions, without the aid of the decisive proof it would afford of the propriety of such action.
Hooking at the case in the aspect in which it is presented in the absence of such aid, I am still satisfied that no error has been established in the course of the court in the particular under consideration. It may, I think, he safely affirmed, that when it appears to this court that the order of a Circuit court was based upon the evidence of facts not found in the record, this court may reasonably and justly presume that the order is right; that it was in accordance with, and justified by the facts.
Now, the sole reliance of the appellant, in his petition to the Circuit court to establish that Moses Hepburn was a slave, was upon the proceedings in a suit in that court. We cannot doubt that the Circuit court had full knowledge of all that was proved or decided in that suit. The appellant has failed to furnish us with any record of that suit. He has placed in this record no evidence of what was proved in it, or of what was its ultimate result. In the absence of such record, are we not well justified in concluding, that if produced it would fail to sustain the pretensions of the appellant, and that the order of the Circuit court was in conformity to its true hearing on the rights of the parties? Such a conclusion would seem to me to be just.
If additional support be needed to sustain this view, it may, I think, be derived from other considerations, which will be briefly adverted to. Moses Hepburn is recognized by the testator in his will as far back as *1817 as being then a free man. In his bill he states that he was married in the year 1827. Of this there is no positive proof, but, from the deposition of the witness McKnight (taken in 1848), who slates that he is acquainted with his wife and children, and who gives the ages of the latter, his marriage must have occurred at least as early as 1832 or 1833. In neither of the petitions is it stated that there was any further illegality or irregularity in his marriage than such as arises from the alleged fact that he was a slave. There is no allegation that the marriage was not in ail its legal observances and forms, such as, if the parties were free persons, would have made it valid.
In his bill he further alleges, that he had duly qualified in the County court of Alexandria as the guardian of his children ; and this is admitted in the petition of the Dnndases; and in 1848 he institutes the present suit, as a free person of color, and so conducts it till 1854, when the petitions were filed; no question having ever been raised, so far as the record discloses, as to his title to freedom, from 1817 to 1854, a period of nearly forty years. If these circumstances, tending to show that for thirty-seven years he had been acting, and had been recognized and treated by the community, as a free person, are not, of themselves, in the absence of all proof to the contrary, except the presumption derived from his color, sufficient to overcome that presumption, and conclusively establish his freedom, they certainly persuade strongly to such a result; and when I consider them in connection with what has been said in respect to the suit referred to in the first petition of the appellant, I experience no difficulty in coming to the conclusion that the Circuit court properly disposed of the petitions, so far as they sought to impede the proceedings on the allegation that Moses Hepburn was a slave.
*960 The question which seems to me to be the most ^proper to be considered next in order, js that raised by the second assignment of errors. It is there objected, that the court had no power or jurisdiction to make a sale of the lands; that the law does not authorize a guardian to have a sale of the land 'of his wards, when, as here, according to the bill, he is tenant for life, and the infants have only a remainder in the lands; that the law contemplates the guardian as simply a fiduciary, and no where authorizes him to file a bill for the sale of real estate wherein he has an interest as well as the infant wards. I do not think that the objection is well founded. The law of 1819, as modified by the act of 1826, which governed the subject at the time when the first decree directing the sale was made, authorized the guardians of infants to file a bill for the sale of the real estate of their wards, as.well where more than one infant should be interested in the land sought to be sold, as where any one or more of those interested should be of full age; and the 2d section of chapter 128 of the Code, which had taken effect before the court made its order (of the 19th of June 1852) sustaining the exception to the report of the sale under the first decree, and directing the commissioner to proceed according to said decree, provides for the exhibition of a bill by the guardian of any minor when he thinks “that the interest of the ward will be promoted by a sale of his real estate, or real estate in which he is interested with others, infants or adults.”
The language ®of the law as it stood, whether at the date of the original decree or at the date of the order of June 1852, directing the commissioner to execute the original decree, is, I think, sufficiently broad to cover the • case. The term “real estate” applies as well to life estates or estates in remainder, as to absolute or entire fees.
Doubtless, one of the leading objects in conferring *the power in question upon the guardians and the courts, was to enable the former more fully to provide for the support, maintenance and education of their wards; and it is urged against the exercise of the povrer in the present case, that the sale will not in anjT manner promote that object, inasmuch as the interest upon the fund during the life of the father is to be enjoyed by him, and not by his children.
I cannot think, however, that the object just mentioned, important as it is, is the only one contemplated by the laws in question. It is not difficult to conceive of numerous instances, in which the want of a power in the courts to sell the remainder of a ward, would occasion the most serious injury to his future interests. The call for a sale of the real estate of an infant, looking to his interest alone, may be just as obvious and urgent in the case where he is the owner of a portion, as where he is the owner of the whole of the fee; and no good reason is perceived why language broad enough to cover both cases should be construed to have conferred the power to sell in the one case and to have withheld it in the other.
When, as here, the guardian is himself the owner of the life estate, there may be considerations, arising out of such fact, of a character to quicken the diligence of the court, in scanning the proceedings, and in seeing to it that the rights of the infants are fully protected; but such considerations furnish no serious grounds for supposing that cases of the kind were designed to be wholly excluded from the operation of the laws under consideration.
The objection stated in the fourth assignment of error, namely, that the evidence on which the decree was founded does not appear to have been taken in the presence of the guardian ad litem, has been met and obviated by the supplement to the record brought up and filed since the appeal was allowed; from which *it sufficiently appears that Yeaton, the guardian ad litem., was present at the tak-’ ing of the depositions.
It is true, as stated in the first assignment of error, that the appellee Moses Hepburn does not formally aver in his bill that he brings the suit in his capacity of guardian ; but this surely can furnish no sufficient ground for reversing the proceedings, when it is seen that the bill distinctly states his qualification as the guardian of his children ; sets out the property belonging to them ; details the facts and reasons going in his opinion to show that it would be to the interest of the children, as the remain-dermen, as well as to his own, as the life tenant, that the lands should be sold and the proceeds properly invested; makes the children all parties; asks that a guardian ad litem be appointed; and indeed throughout its whole frame and structure shows that it was filed with reference to the statute, and with the intent to conform the proceedings to its provisions.
It appears from the deposition of McKnight, that one of the children, Prudence Crandall Hepburn, was over fourteen years of age at the date of the institution of the suit; and it is alleged, as the ground of the third assignment of error, that she has not answered the bill in proper person, as required by the statute.
I do not deem it necessary to consider what weight the Circuit court ought to have allowed to this objection, if it had been brought to its notice before the order confirming the sale was made; inasmuch as it appears it was not raised until at the end of some eighteen months thereafter.
It was certainly an irregularity, due doubtless to inadvertance on the part of the court, to order a sale without first requiring the answer in question to be filed. But I cannot think that a purchaser under such an order, who has allowed the sale to be confirmed ^without objection on his part, has thereafter a peremptory right to make an irregularity of the kind the ground either of vacating the order of *961 sale, or of delaying the execution of subsequent orders passed, to enforce his compliance with the terms of his purchase. If the purchaser regarded the error as one by which his title to the property purchased might be in any manner thereafter affected, he ought to have brought it to the notice of the court before the confirmation of the sale.
It is argued, however, that owing to the unusual course pursued in making the sale in this case, to wit, by means of written proposals or bids made by those desiring to purchase, to the commissioner, and by him reported to the court for its acceptance, the purchaser did not, and could not know whether he was the highest bidder, nor whether, if so, his bid would be accepted by the court, until the report had been returned to the court, his bid accepted, and the sale confirmed; the acceptance of his bid, and the confirmation of the sale by the court, being simultaneous — parts of the same order. Under such circumstances, it is argued, that it would be harsh to apply to the purchaser the rules governing in cases where the sale is conducted in the ordinary mode. In neither case, whether the s.ale is made in the mode pursued in this case, or by way of public auction, is there any complete contract until the report of the commissioner is returned to and approved by the court, and the sale confirmed ; and I can see no substantial reasons for making any distinction between the two cases in respect of the time or opportunity to be allowed the purchasers to show why their inchoate bargains should not be perfected. But in truth, in the present case it is apparent that the purchaser did know, before or at the time the sale was confirmed, that his bid had been accepted by the court. Tor it is seen from the ^record, that the report of the bids was returned to the court on the 10th of May, and the order, reciting the payment, by the purchaser to the commissioner, of the cash stipulated for in his proposal, accepting the bid, and confirming the sale, was made on the 13th of May 1853; and on the same, (last mentioned) day, he entered into, and acknowledged in open court, his bond, setting out the order, and binding him in all respects to fulfill and comply with its requirements.
It is further seen, that the court, at its May term 1853, was still in session on the 18th of the month, an order in this cause being made on that day; that, in July 1853 Cooper notified the commissioner in writing of his purpose to move the court to set aside the sale and refund him the cash he had paid, on the ground of defect of title to the property sold to him; that at the Tebrtiary term 1854 he filed his first petition, setting out the objection already disposed of, of Moses Hepburn being a slave; that at the same term an order was made directing him to show cause, at the following May term, why he had failed to comply with the order of May 1853; and that at the May t^rtn 1854 an order was made allowing the filing of the petition, which should have been, but was not, entered at the P'ebruary term, to be then entered.
It thus appears that Cooper had, after a. knowledge of the fact that his bid was accepted, during the term at which the sale was confirmed, as well as repeatedly thereafter, the amplest opportunity to acquaint himself with all the proceedings in the cause, and to show, if lie could, why he should not be compelled to complete his purchase. Yet nothing is heard of the irregularity in question till the November term 1854, when it is for the first time brought to the notice of fhe court by Cooper, in his supplemental petition then filed.
This review of his conduct, instead of showing him'"'entitled to any exemption from the rules applicable to the case of a purchaser, at a judicial sale made in the usual mode, seeking, after a confirmation of the sale, 1o be excused from his purchase, exhibits such a degree of laches on his part as justly subjects his case to the most rigorous application of those rules. He was not in a position to ask that the sale should be set aside, and he discharged from his contract. The most that he could, in accordance with principles repeatedly announced by this court, properly ask, under the circumstances, was, that he should be protected against any future assertion of claim by the infant over fourteen years of age. See Cralle v. Meem, 8 Gratt. 496; Daniel v. Leitch, 13 Gratt. 195; Goddin v. Vaughn, 14 Gratt. 102. If the result of the proceedings is to afford such protection, there was no error to liis prejudice in dismissing the petition; and such I think is the case.
It has been shown that the case was one over which the court had jurisdiction ; and that all proper parties were before the court. The guardian ad litem had regularly filed his answer as well in behalf of the infant over fourteen years of age as the others; testimony had been duly taken showing that the interests of the infants would be promoted by a sale; and a sale obviously most advantageous to the infants had bren made and confirmed. When, in this state of things, the omission in question was brought to the notice of the court, it might, in abundant caution, and out of regard for a strict observance of the provisions of the statute, intended as an additional safeguard to the rights of the infants, very properljq I think, have ordered the answer to be filed, and stayed all further action in the case till it was filed. But the court (as I feel justified in concluding from the history of the case), being fully satisfied that the bargain which it had made for the infants was a good one; that all before *the court representing their interests were satisfied with the sale; and that the effect of calling for the answer would be simply to delay the proceedings, without in any manner changing the result, has not thought it necessary to supply the omission. I am still satisfied, however, that the *962 purchaser is in no danger of any future disturbance of his .title; that even without reference to the 8th section of chapter 178 of the Code, the infants would not be allowed, because of the defect in the proceedings complained of, to set aside a sale so manifestly beneficial to their interests. Be this as it may, the provisions of that statute do, I think, afford the purchaser full protection. The sale was not made till more than three years after the first order of sale in the cause, and more than eleven months after the second order directing the commissioner to proceed to execute the first order; and the statute declares, that if a salé of property be made under a decree or order of a court, after six months from the date thereof, and such sale be confirmed, though such decree or order be afterwards reversed or set aside, the title of the purchaser at such sale shall not be affected thereby; but there may be restitution of the proceeds of sale to those entitled. The revisors in their note to this section, at p. 878 of their report, after adverting to the fact that purchasers at judicial sales, especially in cases where there are infant parties, are often liable to have their titles impeached after a great lapse of time, and under circumstances most unjust and oppressive, recommend the adoption of the section as a means of remedying the evil. It was argued here that this section does not apply to cases where the lands of an infant are sold at the instance of his guardian, but to those cases only where the sale is in invitum, and incidental or collateral to the main objects of a hostile suit. I can perceive, however, *no just ground for the distinction. The terms of the section are sufficiently comprehensive to embrace both classes of cases; and if it be just and proper that purchasers, under erroneous orders or decrees of sale, in any class of cases, should be protected against impeachments of their titles by infants interested in the cases, it would seem to me peculiarly just and proper to afford them such protection in those cases where the proceedings are for the benefit of the infants, and where the amplest and most efficient means have been prescribed for the protection of their interests.
I see no error in the decree, and thinlc it should be affirmed.
ROBERTSON, J.
With a single exception, I concur in the opinion of Judge Daniel.
It seems to me, that when a sale is confirmed by the court at the same time that the bids are opened and one of them accepted, the purchaser should be allowed a reasonable time after such confirmation, within which to make objections to the title.
In the case of a judicial sale made in the ordinary mode, the purchaser has an opportunity, and it is his duty to look into the title after he knows that he is the highest bidder, and before the sale is confirmed. If he fails to avail himself of this opportunity, and allows the sale to be confirmed without objection, it is not unreasonable that he should be precluded from objecting to the title afterwards. But no such opportunity exists when the sale is confirmed at the time of opening and accepting the bid. To hold that the purchaser stands on the same footing in each case, is in effect to require that he shall take the trouble and expense of investigating the title before he bids, or at least before he knows, that he is the highest bidder — a rule which, if not known, must operate unjustly *against purchasers at judicial sales; and, if known, can only have the effect of depreciating the price of the property, by diminishing the number of bidders.
Under the circumstances of this case, however, I concur in the affirmance of the decree of the Circuit court.
MONCURE, J., concurred in the opinion of Daniel, J.
Decree affirmed.